RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DANNY LAMONT CHAMBERS; DONTELL RAYVON-
EDDIE SMITH,

                        *Plaintiffs-Appellants*,

     *v.*

RONALD SANDERS; CITY OF DETROIT, MICHIGAN,

                     *Defendants-Appellees*.

     No. 22-1446

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cv-10746—Paul D. Borman, District Judge.

Decided and Filed: April 3, 2023

Before: MOORE, GIBBONS, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:** Christopher P. Desmond, JOHNSON LAW, PLC, Detroit, Michigan, for Appellants. Christopher J. Raiti, Shneur Nathan, NATHAN & KAMIONSKI LLP, Detroit, Michigan, for Appellees.

     GIBBONS, J., delivered the opinion of the court in which LARSEN, J., joined. MOORE, J. (pp 12–29), delivered a separate dissenting opinion.

───────────────

## OPINION

───────────────

     JULIA SMITH GIBBONS, Circuit Judge. Danny Lamont Chambers and Dontell Rayvon-Eddie Smith allege that Detective Ronald Sanders and his employer, the City of Detroit, violated their Fourteenth Amendment right to familial integrity by procuring the wrongful

conviction and incarceration of their father, Danny Burton.  Even assuming that the plaintiffs have identified a substantive right protected by the Due Process Clause, their claim cannot succeed because they have not alleged that defendants acted with a culpable state of mind, directed toward them or their family unit.  We affirm.

I.

In 1987, a Michigan state court jury convicted Danny Burton of first-degree murder and a firearm charge.  He was sentenced to life in prison without the possibility of parole.  The complaint in this case alleges that the conviction primarily rested on witness testimony from individuals who were present at the home where the shooting had allegedly occurred.  In December 2019, Burton was released from prison and his conviction was vacated on the prosecutor's motion, after key witnesses recanted and details of witness manipulation and intimidation were revealed.  Detective Ronald Sanders's investigative tactics allegedly included threats and physical violence against witnesses, including minors, to secure their testimony against Burton.  Plaintiffs allege that, as a result, Burton spent thirty-two years in prison.

In July 2020, Burton filed claims under §§ 1983 and 1988 against Sanders and the City of Detroit for *Brady* violations, malicious prosecution, and fabrication of evidence.  The district court granted the city's motion to dismiss Burton's claims, finding that Burton's claims were barred by the city's Chapter 9 bankruptcy which occurred after Burton's claims arose.  Detective Sanders did not move to dismiss and Burton's claims against him were still pending in the district court as of the time of this appeal.

Several months after the city was dismissed from Burton's suit, Burton's sons filed the instant suit against Sanders and the city.  His sons, Danny Lamont Chambers and Dontell Rayvon-Eddie Smith, allege that the wrongful conviction and incarceration of their father throughout their childhood and into adulthood violated their constitutional right to family integrity.  They do not assert that Sanders's actions were directed at the family unit or intended to break up the family; rather, they claim that their "rights were violated when defendants violated Mr. Burton's rights."  DE 1, Compl., Page ID 11.

The district court granted Sanders' motion to dismiss the § 1983 claim against him, finding no cognizable due process right for "interference with family integrity" when a party is indirectly harmed by a constitutional tort against a family member. The district court further granted the city's motion to dismiss Chambers and Smith's *Monell* claim because it relied on the same theory of due-process parental interference that the court dismissed against Sanders. With the federal claims dismissed, the court declined to exercise supplemental jurisdiction over Chambers and Smith's state-law claims. Chambers and Smith timely appealed the district court's grant of the motions to dismiss.

## II.

On appeal, Chambers and Smith reassert their argument that the substantive due process right of familial association extends to cases where the state has wrongfully incarcerated a parent for a significant period and argue that the district court erred in dismissing their federal claims under Rule 12(b)(6).

We review de novo a district court's dismissal of a plaintiff's claims under Rule 12(b)(6). *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). For a claim under 42 U.S.C. § 1983, the plaintiff must allege two elements: (1) "the defendant acted under color of state law;" and (2) "the defendant's conduct deprived the plaintiff of rights secured under federal law." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). As the city and Sanders have not contested that Sanders was acting "under color of state law" in course of his investigation, we focus our inquiry on the second prong: whether the challenged conduct deprived Chambers and Smith of a federal right.

The Fourteenth Amendment's substantive due process protections guard against "governmental deprivations of life, liberty, or property . . . regardless of the adequacy of the procedures employed." *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992). It protects both constitutionally enumerated rights, as well as rights "so rooted in the traditions of the people as to be ranked

fundamental" and implicit in the concept of ordered liberty, or the interest in freedom from government actions that "shock the conscience." *Id.*; *see also Bell v. Ohio State Univ.*, 351 F.3d 240, 249-50 (6th Cir. 2003). In recognizing unenumerated rights, the Supreme Court counsels hesitation: "We must . . . exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of" the judiciary. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (internal alteration, citations, and quotation marks omitted). "To say the least, it's a tough test." *Golf Vill. N., LLC v. City of Powell*, 42 F.4th 593, 601 (6th Cir. 2022).

The Due Process Clause has historically protected some rights that are grounded in family integrity and autonomy. *See Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."). However, this longstanding liberty interest has traditionally applied to either state actions directed at the family relationship, such as visitation or child custody, or state regulation of decisions within the ambit of parental control, such as educational decisions, the choice of living arrangements, and the choice to have children. *See Troxel v. Granville*, 530 U.S. 57, 66-69 (2000) (custodial rights of fit parents); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (right of parents to make educational decisions); *Moore v. City of East Cleveland*, 431 U.S. 494, 499-500 (1977) (plurality opinion) (right of extended family members to live together); *Skinner v. State of Okla. ex rel. Williamson*, 316 U.S. 535 (1942) (right to have children). The contours of these rights are guided by history and tradition, and they are not absolute; "the family is not beyond regulation." *Moore*, 431 U.S. at 499.[1]

---

[1]Whatever the scope of the substantive rights that might be grouped under the heading of "family integrity," neither this court nor the Supreme Court has held that such rights are shared equally by parent and child, *see Michael H. v. Gerald D.*, 491 U.S. 110, 130 (1989) ("We have never had occasion to decide whether a child has a liberty interest, symmetrical with that of her parent, in maintaining her filial relationship."). Our own precedent has held only that children may assert reciprocal procedural due process protections in the context of child removal proceedings. *Kovacic v. Cuyahoga Cnty. Dep't of Child & Fam. Servs.*, 724 F.3d 687, 700 (6th Cir. 2013). We note

This circuit has not previously decided whether the right to family integrity is implicated whenever the state deprives a child of routine interaction with a parent through wrongful incarceration. *Cf. Purnell v. City of Akron*, 925 F.2d 941, 948 n.6 (6th Cir. 1991) (declining to decide the issue of whether the children of a man wrongfully killed by state police could bring a § 1983 claim for deprivation of the parent-child relationship). We address the issue now and hold that it is not.

III.

We may assume for purposes of this case that plaintiffs have identified a liberty interest protected by the Fourteenth Amendment. Even so, it would not be violated here because plaintiffs have not alleged that any state actor intruded on that right with the culpability required to state a due process violation. *Daniels*, 474 U.S. at 331; *Lewis*, 523 U.S. at 848. This conclusion is supported by the majority of our sibling circuits and our own precedent.

A.

The Supreme Court has explained that "[h]istorically, the guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (collecting cases). The "Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847 (internal quotation marks and citation omitted). Negligent behavior categorically fails to shock the conscience, while conduct intended to injure is "most likely to rise to the conscience-shocking level." *Id.* at 849. Accordingly, the majority of circuits have recognized that "not every . . . act that results in an interference with the rights of familial association is actionable." *Lowery v. County of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008) (cleaned up and internal quotation marks and citations omitted). As with every substantive violation of the Due Process Clause, the state must have acted toward the plaintiff with a culpable state of mind. *See id.* ("The conduct or

---

also that, under the Supreme Court's caselaw, the Due Process rights of parents—and hence any reciprocal rights of children—may vary depending on a number of facts that are not alleged in the complaint, such as the parents' marital and custodial status. *See Michael H.*, 491 U.S. at 128130; *Lehr v. Robertson*, 463 U.S. 248, 261 (1983). We decline to address the issue here.

statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship."); *Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 9 (1st Cir. 1986) ("We decline, on this record, to make the leap ourselves from the realm of governmental action directly aimed at the relationship between a parent and a young child to an incidental deprivation of the relationship between appellants and their adult relative."); *Gorman v. Rensselaer County*, 910 F.3d 40, 48 (2d Cir. 2018) ("[A] claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship."); *McCurdy v. Dodd*, 352 F.3d 820, 827-28 (3d Cir. 2003) ("In the context of parental liberty interests . . . the Due Process Clause only protects against deliberate violations of a parent's fundamental rights—that is, where the state action at issue was specifically aimed at interfering with protected aspects of the parent-child relationship."); *Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005) ("[F]inding a constitutional violation based on official actions that were not directed at the parent-child relationship would stretch the concept of due process far beyond the guiding principles set forth by the Supreme Court."); *Partridge v. City of Benton*, 929 F.3d 562, 568 (8th Cir. 2019) ("Pleading a plausible familial-relationship claim under § 1983 requires an allegation that the state action was intentionally directed at the familial relationship . . . Partridge and Schweikle did not allege in their complaint, or argue on appeal, that Ellison's shooting was directed at their relationship with Keagan.  This forecloses their claims."); *Shaw v. Stroud*, 13 F.3d 791, 804-05 (4th Cir. 1994).

Plaintiffs, by contrast, seek to state a claim for violation of their own Due Process rights without any showing of a culpable mental state directed toward them.  Plaintiffs claim that defendants violated their father's constitutional rights through *Brady* violations, malicious prosecution, and fabrication of evidence and that the City is liable to their father under *Monell*. As to their own constitutional claims, they say simply that they have a "constitutional right to have their family unit protected," which was necessarily "violated when defendants violated Mr. Burton's rights, which caused Mr. Burton to be falsely convicted and imprisoned."  DE 1, Compl., Page ID 11.  But holding a government actor automatically responsible for incidental harms flowing from his actions imposes strict liability—a result directly contrary to *Daniels*, which clarifies that the Due Process Clause "serves to prevent governmental power from being

used for purposes of oppression." *Daniels*, 474 U.S. at 331 (internal quotation marks and citation omitted). In *Daniels*, the Supreme Court held that the "Due Process Clause is simply not implicated" by an act "causing unintended loss of injury to life, liberty, or property," even when a government official acts *negligently* with respect to the plaintiff's constitutionally protected interests. *Id.* at 328. Nor can it be implicated when a government official unintentionally harms those interests with no culpable state of mind directed toward them at all.

The only circuit to agree with the plaintiffs' approach is the Ninth Circuit, which allows children to claim violation of their right to family integrity against state actions which incidentally impact their relationship with their parents. *See Smith v. City of Fontana*, 818 F.2d 1411, 1417-20 (9th Cir. 1987), overruled on other grounds by *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999); *Kelson v. City of Springfield*, 767 F.2d 651, 655 (9th Cir. 1985). The Ninth Circuit's view is based primarily on a broad reading of the substantive due process right to family association and the legislative history of the Ku Klux Klan Act of 1871, the precursor to 42 U.S.C. § 1983. *Smith*, 818 F.2d at 1418-1419.

The Ninth Circuit's analysis is flawed in both respects. First, as already discussed, the Supreme Court has cautioned against such broad interpretations of rights under the due process clause. *See Glucksberg*, 521 U.S. at 720. Second, the Ninth Circuit mischaracterizes the legislative history on which it relies. The cited passage is a statement by Representative Benjamin Butler of Massachusetts describing the Ku Klux Klan Act as "a remedy for wrongs, arsons, and murders done. This is what we offer to a man whose house has been burned, as a remedy; to the woman whose husband has been murdered, as a remedy; *to the children whose father has been killed, as a remedy*." Cong. Globe, 42d Cong., 1st Sess. 807 (1871) (emphasis added). But a closer look at Butler's remarks is revealing. *See* Michael S. Bogren, *The Constitutionalization of Consortium Claims*, 68 U. DET. L. REV. 479 (1991), for an academic discussion of this legislative history. Butler's comments were directed at § 6 of the Ku Klux Klan Act. Globe at 800, 804, 807. That section created a remedy for the "legal representatives" of a deceased to recover no more than $5,000 in damages "for the benefit of the widow" or "next of kin." *See id.* at 804. Section 6 is now codified as § 1986, *not* § 1983. *See* 42 U.S.C. § 1986. Representative Butler was an opponent of this provision, who mocked it and said that he did not

believe any real cases would be decided under it. Globe at 807. ("So far as this particular provision is concerned . . . . I look upon it as utterly useless, a mere illusion and delusion."). He explained he was only voting for it in an apparent horse-trade to get another part of the bill passed. *Id.* ("There is not a man who believes there will ever be a verdict under it. It is here that we may throw dust into the eyes of the people, and for no other purpose. But for all that, I will vote for the bill . . . although opposed to many things in it, because I must take . . . the bitter with the sweet."). Indeed, immediately after Butler concluded his remarks, Representative (and later president) James Garfield, an advocate for the Act, condemned Butler's continued opposition and his attempt to "rise[] at the last moment to throw all the contempt he can upon the bill." *Id.* Garfield then took it upon himself to clarify the content of each section of the Act. *Id.*

This legislative history, contextualized, does not support the view that the Congress that passed § 1983's precursor intended that all children of parents wrongfully killed or incarcerated by police were entitled to a constitutional remedy under § 1983. And even if it did, that *statutory* conclusion about the scope of § 1983 would not affect the contours of the *constitutional* right to familial association under the Due Process Clause. At most, it would suggest that the children of an individual whose constitutional rights are violated may sue derivatively under § 1983 to vindicate the *parent's* constitutional rights—a proposition our case law has already rejected. *See Purnell*, 925 F.2d at 948 n.6 (citing *Jaco v. Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984)); *see also infra* at 8-9.

B.

Analogous cases from this circuit confirm that no constitutional violation of the right to family association exists without a state action directed at the family relationship. In § 1983 cases where family members of those wrongfully killed by police claim infringement of the right to familial association, we have rejected such claims as collateral. As we explained in *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000):

> In the Sixth Circuit, a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort. Accordingly, only the purported victim, or his estate's representative(s), may prosecute a section 1983 claim; conversely, no cause of action may lie under section 1983 for emotional distress,

> loss of a loved one, or any other consequent collateral injuries suffered personally by the victim's family members.

*Id.* at 357 (citations omitted). Denying relief for a family member permanently deprived of a loved one through state action suggests *a fortiori* that relief should also be denied for those deprived of their loved ones for temporary periods, such as through wrongful incarceration. While *Claybrook* involved a plaintiff who sought to assert the constitutional rights of a deceased family member and not his own right to familial association, this court has applied the principle more broadly.

In unpublished cases, we have consistently rejected § 1983 claims of family members explicitly seeking to vindicate their *own* constitutional right to family integrity and not the rights of their deceased family member. *See LeFever v. Ferguson*, 645 F. App'x 438, 447 (6th Cir. 2016); *Foos v. City of Delaware*, 492 F. App'x 582, 593 (6th Cir. 2012). In *Foos*, we reiterated the language from *Claybrook* we previously quoted and explained that even when state action that detains or kills an individual is reframed as a deprivation of his or her relation's right to familial association, no cause of action exists under § 1983. *Id.* at 592-93. *Foos* further rejected the Ninth Circuit's approach in *Smith* of allowing such claims. Even more recently in *LeFever*, we again rejected a family-integrity claim by children whose parents were killed by state police officers. *Id.* at 447-48. In that opinion, the panel majority—like that in *Foos*—expressly declined to follow the Ninth Circuit's approach of allowing claims by children who are deprived of their familial relationships because their parent is wrongfully killed by a state actor. *Id.* *LeFever* stands alongside *Foos* and *Claybrook* in rejecting similar claims to those brought by Chambers and Smith.

Our precedent and that of most other circuits lead us to conclude that substantive due process claims based on the right to family integrity require that the state official act with a culpable state of mind directed at the family relationship. The due process right of familial association does not protect against all forms of state action that impact parent-child relationships.

C.

As we explained above, actions that collaterally impact the family relationship are insufficient to give rise to a substantive due process claim that the state has violated an individual's right to family integrity. The government official must have, at a minimum, acted with a culpable state of mind directed at the plaintiff's family relationship or a decision traditionally within the ambit of the family. Thus, many state actions with collateral effects on families are not constitutional violations. *See Halley v. Huckaby*, 902 F.3d 1136, 1155 (10th Cir. 2018).

To clarify this rule, two points must be made. First, the standard we adopt today will not be met simply because a government official acted intentionally. A government official can make a wrongful, intentional decision, as the alleged facts here demonstrate, without that intent or the decision itself being aimed at the family relationship. Instead, as with any due process violation, stating a claim in this context requires that the state actor act with a culpable state of mind with respect to the plaintiffs themselves and their own alleged constitutional rights. This rule aligns with precedent. As a baseline, the Supreme Court has held that merely negligent conduct cannot give rise to a due process violation. *Daniels v. Williams*, 474 U.S. 327, 333 (1986). *A fortiori*, a mere incidental harm cannot give rise to due process violation. "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848. To rise to the level of a "conscience shocking" violation of rights in the constitutional sense, the harm suffered by a family member must be more than a collateral consequence of other wrongful state action. *See generally Range v. Douglas*, 763 F.3d 573, 591 (6th Cir. 2014) (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001)) ("A government actor who has time to deliberate shocks the conscience if the actions 'were taken with deliberate indifference towards the *plaintiff's* federally protected rights.'") (emphasis added). It is not enough that some wrongful intent existed at some point in the chain of events.

Second, it will admittedly be a rare case in the wrongful incarceration context that meets this standard. That rarity is appropriate in light of both the narrow scope of substantive due process generally and our case law and that of other circuits consistently rejecting such claims in

the Fourteenth Amendment context. On the other hand, were we to dispense with the requirement that the government action at issue target the family relationship, then every close family member of a wrongfully incarcerated individual would have a constitutional claim based on the incidental, even unknowing, impact of that individual's incarceration on the family relationship. As discussed above, that conclusion cannot be squared with the Supreme Court's case law, or that of this circuit and nearly all of our sister circuits.

D.

Applying this framework to the instant case, Chambers and Smith have not pled facts to state a claim that Sanders's conduct was directed at interfering with their parent-child relationship. We cannot conclude that Sanders's investigative misconduct and deliberate indifference toward *Burton's* federally protected rights also amounts to "conscience shocking" treatment of *his children's* federally protected rights. *See also* DE 1, Compl., Page ID 7 ("Defendant [Sanders] . . . conspired to knowingly deprive Mr. Burton of his constitutional rights under the 4th Amendment, and to *thereby* deprive Plaintiffs of their constitutional right to be with their father.") (emphasis added). Chambers and Smith do not allege that their rights were targeted by Sanders, but instead that violations of their rights were an inevitable byproduct of Sanders's violation of their father's constitutional rights. These allegations do not state a due process claim. Therefore, we affirm the district court's dismissal of Chambers and Smith's § 1983 claim against Sanders in his individual capacity.

As no constitutional rights violation occurred under the facts alleged, Chambers and Smith's *Monell* claim was also properly dismissed. *Monell* claims allow for municipal liability "for the constitutional violations of their employees only where the municipality's policy or custom led to the violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). However, "[t]here can be no liability under *Monell* without an underlying constitutional violation." *Id.* With no underlying rights violation plausibly established in their complaint, we affirm the district court's dismissal of Chambers and Smith's *Monell* claim against the city.

IV.

For the foregoing reasons, we affirm.

———————————————

**DISSENT**

———————————————

KAREN NELSON MOORE, Circuit Judge, dissenting. I respectfully disagree with the majority's determination that Appellants failed to allege that Detective Sanders violated their due-process rights to family association and integrity. When the state incarcerates a parent, there are, as the majority notes, "incidental, even unknowing, impact[s] of that . . . incarceration on the family relationship." Majority Op. at 11. Those "incidental . . . impacts"—such as the loss of companionship, the child's ability to hug their parent, cry on their shoulder, celebrate an accomplishment, or turn to their parent for advice—are often devasting to the child and the family relationship. When the conviction turns out to be in error and the parent has been mistakenly incarcerated for a crime that they did not commit, the impacts may feel even more tragic and severe. Though unfair and unjust, the state and its official have not necessarily deprived the child of their due-process rights. But that is not the case before us. Instead, we are faced with children who lost their association with their father for thirty-two years because a police officer deliberately and intentionally procured a false conviction against their father that condemned him to a life sentence of imprisonment.

I disagree with the majority that a state official deprives a person of their due-process right to family association and integrity only when the state official "acted with a culpable state of mind directed at the plaintiff's family relationship or a decision traditionally within the ambit of the family." Majority Op. at 10. I believe that this new requirement lacks support in our controlling precedent. Instead, I believe that we should apply the shocks-the-conscience standard to the official's conduct. Therefore, I would measure whether Appellees' conduct towards the Appellants—intentionally and deliberately procuring a wrongful conviction against their father and depriving them of their father—shocks the conscience. I would hold that when the child loses this relationship to the perpetual absence of their parent because a state official deliberately and intentionally procured a wrongful conviction, the official deprives the child of their due-process right to family association and integrity. But even under the majority's test, I nonetheless believe that Appellants' allegations and the reasonable inferences drawn from those

allegations are sufficient at the pleading stage to demonstrate that Sanders's decision was aimed at the family relationship.

Because the majority overlooks the intentional and bad-faith nature of Appellants' allegations, I begin there.

## I.  DELIBERATE AND INTENTIONAL CONDUCT

In 1987, a Wayne County jury convicted Danny Burton of first-degree murder and a felony-firearm charge, and he received a sentence of life in prison without the possibility of parole.  R. 1 (Compl. ¶ 9) (Page ID #3).  After thirty-two years of incarceration—thirty-two years of separation between parent and child—the state finally freed Appellants' father in light of evidence of his innocence and the grossly unconstitutional and bad-faith investigation leading to his wrongful convictions.  *See id.* ¶ 13 (Page ID #3–4).

The relevant events began in May 1987, after the killing of Leonard Ruffin, when police suspected Burton of the killing and arrested him.  *Id.* ¶¶ 10, 14–15 (Page ID #3–4).  According to the Complaint, while Burton was in custody, Detective Sanders threatened, intimidated, and inflicted physical violence on Burton to pressure him to confess to Ruffin's killing and to waive certain constitutional rights.  *See id.* ¶¶ 6, 16–17 (Page ID #2, 4).  On Appellants' information and belief, Sanders "*knew*" that their father had not killed Ruffin and knew who committed the killing.  Appellants Br. at 13; R. 1 (Compl. ¶ 25) (Page ID #6).

According to the Complaint, Sanders also suppressed exculpatory evidence, fabricated evidence, and coerced witnesses into making false statements and false testimony through threats and physical, mental, and emotional abuse—statements they subsequently recanted.  One witness, Felicia Gilchrist, whose trial testimony supported the convictions, later attested that she made false statements and gave false testimony because of Sanders's threats to charge her mother and her uncle with murder and "make sure [her] children were taken from" her.  R. 1-4 (Compl., Ex. 4 (May 9, 2005 Statement)) (Page ID #28–29); *see also* R. 1 (Compl. ¶ 19) (Page ID #5).  Gilchrist attested in her affidavit that when Sanders first asked about Burton and his co-defendants, she "told him that they were not present at the time of the shooting" but Sanders arrested her, threatened her with the loss of her children, and threatened to charge her mother and

uncle for the murder. R. 1-4 (Compl., Ex. 4 (April 13, 2007 Aff.) ¶¶ 3, 6–7) (Page ID #32–33). Gilchrist also attests to repeated acts of bribery by Sanders. *Id.* ¶ 11 (Page ID #34).

Gilchrist's mother, Lula Gilchrist, recalls a similar experience; she too gave "untrue" testimony at trial because of Sanders's threat to "charge [her] with the murder." R. 1-5 (Compl., Ex. 5 (May 5, 2005 Statement) at 1) (Page ID #36); R. 1 (Compl. ¶ 20) (Page ID #5). Another witness, Alfreda Jackson, attested that Sanders coerced her into signing a false statement that he drafted while she was intoxicated on cocaine. R. 1 (Compl. ¶ 22) (Page ID #5); R. 1-7 (Compl., Ex. 7 (April 6, 2007 Aff.) ¶ 5) (Page ID #44).

Deandre Bolden, a teenager at the time, "originally gave a statement . . . that [he] did not see the shooting" or "the shooter" but after he was "questioned for most of a day with no food or water" outside the presence of his mother, Sanders threatened that Bolden would be killed or charged with the murder "if [Bolden] didn't give Det. Sanders the answered he wanted." R. 1-8 (Compl., Ex. 8 (Dec. 13, 2010 Aff.) ¶¶ 1–2) (Page ID #47); R. 1 (Compl. ¶ 23) (Page ID #5–6). Bolden was also "punched in the stomach and the ribs." R. 1-8 (Compl., Ex. 8 (Dec. 13, 2010 Aff.) ¶¶ 1, 3) (Page ID #47). Bolden attested to similar coercion and physical violence when he tried to testify truthfully at trial. *See id.* ¶ 3 (Page ID #47). The Complaint also alleges that "Detroit Police officers abused" Clara Hill Williams—also a minor at the time—and "kept her in a room for hours without letting her go to the bathroom and forced her to sign a statement that she did not make" that Burton and his co-defendants committed the killing. R. 1 (Compl. ¶ 24) (Page ID #6); R. 1-9 (Compl., Ex. 9 (Feb. 9, 2011 Interview) at 1–3) (Page ID #49–51). Then, during trial, an "officer also kept her in a room over night to stop her from testifying at trial, knowing that she would contradict the prosecution's theory of the case." R. 1 (Compl. ¶ 24) (Page ID #6). Williams attested that she "thought [the police officers] were going to kill [her]." R. 1-9 (Compl., Ex. 9 at 3) (Page ID #51).

According to Appellants, the "fabricated evidence was material to [both] a finding of probable cause" in support of Burton's arrest and a guilty verdict against Burton. R. 1 (Compl. ¶¶ 61–62) (Page ID #14). By knowingly suppressing exculpatory evidence before Burton's trial, (*e.g., id.* ¶¶ 28, 32, 45 (Page ID #7–8, 12)), and coercing and eliciting false testimony (*e.g., id.* ¶¶ 19–24, 34, 55–56 (Page ID #5–6, 8, 13)), Sanders and the City tore Appellants' father away

from them for thirty-two years, deprived them of their right to a family unit, and caused them to "grow up fatherless." *Id.* ¶¶ 26, 50 (Page ID #6–7, 11).

Undoubtedly, Appellants' Complaint contains numerous allegations regarding Sanders's and the City's efforts to deprive *Burton* of his constitutional rights. Though a poor decision to include so many references to the deprivation of Burton's constitutional rights in a case alleging the deprivation of only Burton's children's rights, that same underlying conduct serves as the factual predicate for Appellants' claims before this court—that Sanders and the City "targeted Mr. Burton['s] . . . family," (R. 1 (Compl. ¶ 31) (Page ID #8)), by intentionally, knowingly, and in bad-faith depriving them of their father for decades. Just because Appellants erroneously *also* included allegations that Burton's rights were violated does not erase their allegations regarding their own rights. The majority should have just disregarded the references to how Sanders's and the City's conduct violated Burton's rights as merely irrelevant and superfluous to Appellants' claims, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 370 (6th Cir. 2011), rather than use those allegations to frame Appellants' claims, Majority Op. at 6.

From the Complaint, I draw two common-sense inferences. *See Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020). First, Sanders—"an experienced [and] well-trained police officer" and detective (R. 1 (Compl. ¶¶ 6, 29) (Page ID #2, 7))—spent months investigating Burton for first-degree murder and presumably knew that the suspect of his investigation had children, (R. 1 (Compl. ¶¶ 9–10) (Page ID #3); *see also id.* ¶ 31 (Page ID #8)). Second, as an experienced officer and detective, Sanders would certainly know, better than most, that incarceration separates families. That Sanders had a deep appreciation for the consequences of what would happen to the family unit by wrongfully incarcerating someone is further strengthened by testimony that Sanders actually linked incarceration with the breaking of the family unit. The sworn testimony of Felicia Gilchrist demonstrates his understanding of this link. *See* R. 1-4 (Compl., Ex. 4 (April 13, 2007 Aff.) ¶¶ 3, 6–7) (Page ID #32–33) (attesting Sanders arrested her and threatened her with the loss of her children and jail time for her mother and uncle). To me, this indicates Sanders's knowledge that wrongful incarceration destroys the family unit. Thus, I believe we could reasonably infer that Sanders knew that Burton had children and knew that incarcerating him for the duration of his life would destroy Appellants' family unit.

## II.  THE RECIPROCAL NATURE OF THE DUE-PROCESS RIGHT TO FAMILY ASSOCIATION AND INTEGRITY

Our precedent well establishes "that the relationship between parent and child is constitutionally protected." *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006) ("[U]nder the constitution, the parent-child relation gives rise to a liberty interest."). The Supreme Court's numerous decisions regarding the Due Process Clause's protection of this relationship "made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody, and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" *Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 27 (1981) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)); *see also Schulkers v. Kammer*, 955 F.3d 520, 539–40 (6th Cir. 2020). The "attempt to force the breakup of a natural family, over the objections of the parents and their children," absent "some showing of unfitness" "offend[s]" the Due Process Clause. *Quilloin*, 434 U.S. at 255 (quoting *Smith v. Org. of Foster Fams. For Equal. & Reform*, 431 U.S. 816, 862–63 (1977) (Stewart, J., concurring in the judgment)). "[F]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982) (Rehnquist, J., dissenting)). These principles have deep roots in our caselaw.

The majority overlooks the unique nature of the due-process right to family association and integrity—it is a reciprocal right that exists within one shared relationship between multiple people. *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 700 (6th Cir. 2013) (rejecting argument that only parents had a liberty interest in parent-child relationship because "the Supreme Court has described the due-process right as one that applies to both children and parents"); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) ("This right to the preservation of family integrity encompasses the *reciprocal rights of both parent and children*." (emphasis added)). A parent has an "interest . . . in the 'companionship, care, custody and management of his or her children,'" *id.* (quoting *Stanley*, 405 U.S. at 651), and children maintain an interest "in not being dislocated from the 'emotional attachments that derive from

the intimacy of daily association,' with the parent,"**1** *id.* (quoting *Smith v. Org. of Foster Fams. For Equal. & Reform*, 431 U.S. 816, 844 (1977)); *see also Kovacic*, 724 F.3d at 700; *Wooley v. City of Baton Rouge*, 211 F.3d 913, 923 (5th Cir. 2000) ("[A] child's right to family integrity is concomitant to that of a parent."); *Smith v. City of Fontana*, 818 F.2d 1411, 1417–19 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (recognizing right's reciprocal nature and children's cognizable liberty "interest in the continued companionship" of their parent). "This mutual interest in an interdependent relationship has received consistent support in the cases of the Supreme Court." *Duchesne*, 566 F.2d at 825. Unlike many other rights, here conduct that deprives one family member of their ability to associate with their family likewise deprives the family of their constitutional right and ability to associate with that member. This reciprocal nature of the right means that conduct alleged to deprive each person of their rights to family association will also overlap. This reality should inform determinations regarding whether a state official has violated the right.

### III.  THE MAJORITY'S "STATE OF MIND" REQUIREMENT LACKS SUPPORT IN PRECEDENT

The majority's introduction of a "state of mind" requirement lacks a basis in our precedent and conflates the required degree of culpability of an official's actions with a state-of-mind requirement. First, § 1983 itself "contains no independent state-of-mind requirement." *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *see also Monroe v. Pape*, 365 U.S. 167, 187 (1961) (rejecting specific-intent requirement for § 1983 claims). Second, the Supreme Court's

---

**1**The Second Circuit in *Duchesne* recognized the tremendous importance of this reciprocal liberty interest to both the parent and the child.

> [T]he reciprocal liberty interest of parent and child in the familial bond between them[] need[s] no greater justification than that they comport with each state's fundamental constitutional commitment to individual freedom and human dignity. But the right of parents to raise their children as they think best, free of coercive intervention, comports as well with each child's biological and psychological need for unthreatened and unbroken continuity of care by his parents. No other animal is for so long a time after birth in so helpless a state that its survival depends upon continuous nurture by an adult. Although breaking or weakening the ties to the responsible and responsive adults may have different consequences for children of different ages, there is little doubt that such breaches in the familial bond will be detrimental to a child's well-being.

566 F.2d at 825 n.19 (quoting Goldstein, *Medical Care for the Child at Risk: On State Supervention of Parental Autonomy*, 86 Yale L.J. 645, 649–50 (1977)).

precedent instructs that we ask whether the official's *conduct* shocks the conscience to determine whether an executive official violated a person's substantive-due-process rights. But the majority looks outside this framework and instead turns to other sibling circuits to impose a state-of-mind requirement—a requirement with an outdated and mooted rationale.

In 1985, the Tenth Circuit appears to have first introduced a requirement similar to today's majority's when it "conclude[d] that an allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under section 1983." *Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 768 F.2d 1186, 1190 (10th Cir. 1985). One of *Trujillo*'s rationales for the requirement was that allowing such claims in instances of government *negligence* would swallow § 1983 and flood the courts with cases. *See id*. Its specific-intent requirement served to "provide a logical stopping place for such claims." *Id*.; *see also Halley v. Huckaby*, 902 F.3d 1136, 1155 (10th Cir. 2018) ("[W]hen our court first applied this intent requirement in *Trujillo* . . . we did so to prevent this doctrine from turning all negligent torts leading to the death of a child into constitutional violations. Some degree of severity was required, we explained, to 'provide a logical stopping place for such claims.'" (quoting *Trujillo*, 768 F.2d at 1190)). *Trujillo* noted that "other courts ha[d] *not* imposed any state of mind requirement to find a deprivation of intimate associational rights." 768 F.2d at 1190 (emphasis added).

The Supreme Court, shortly thereafter, alleviated the need for the "logical stopping place for" due-process claims. *See id.* First, in *Daniels*, it determined that negligent conduct could not give rise to a Due Process Clause violation. 474 U.S. at 334. Then, in *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998), the Court explained that under the shocks-the-conscience standard for substantive-due-process violations, which applies to executive action, an official's conduct constitutes a due-process violation when the official's conduct is "something more than negligence," and is either intentional conduct or conduct that is "less than intentional conduct, such as recklessness or gross negligence." *Id.* (quoting *Daniels*, 474 U.S. at 334 & n.3).

With the benefit of *Daniels*, the Ninth Circuit examined *Trujillo*'s specific-intent requirement and explained why *Daniels* rendered that requirement unnecessary. *City of Fontana*, 818 F.2d at 1420 n.12. *City of Fontana* explained:

> *Trujillo* imposed this requirement of specific intent on a claim of interference with the familial relationship in order to avoid throwing open the judicial floodgates to claims based on merely negligent acts.  Now that *Daniels* has closed this potential floodgate by requiring the act causing the deprivation to have been more than simply negligent, *Trujillo*'s additional focus on the state actor's motivation is no longer necessary to serve its purpose.

*Id*. (citations omitted).  *City of Fontana* "therefore decline[d] to follow *Trujillo*" and established that "[a]s long as the state official's *action* which deprived the plaintiffs of their liberty was more than merely negligent, the plaintiffs can state a section 1983 claim without further alleging that the official was trying to break up their family." *Id.*

Lewis specifically framed the inquiry as "[w]hether the point of the conscience shocking is reached *when injuries are produced with culpability* falling within the middle range, *following from something* more than negligence but 'less than intentional *conduct*, such as recklessness or gross negligence.'" 523 U.S. at 849 (emphasis added).  The Supreme Court told us to measure the injury and the official's conduct from which it flowed.  *See id.*  *Lewis* recognized that in instances governed by "unforeseen circumstances [that] demand an officer's *instant* judgment," conduct will rise to the level of conscience shocking where the officer has "a purpose to cause harm."  523 U.S. 853–54.  It expressly distinguished between other instances in which government officials have the benefit of time—an "extended opportunit[y] to do better." *Id*. at 853.  *Lewis* thus affords some latitude in the determination of whether a state official's conduct shocks the conscience by contextualizing the officer's conduct with the speed and circumstances of the events at issue.  *See id.* at 853–54.  Like *Daniels*, *Lewis* addressed the Tenth Circuit's judicial-economy concerns by elaborating on the spectrum of conduct that shocks the conscience.  It also indicates that, when, as here, an official had an "extended opportunit[y] to do better," *Lewis*, 523 U.S. at 853, a specific intent is not required to establish a due-process violation.

Like *City of Fontana*, I agree that a pre-*Daniel* and pre-*Lewis* justification for such an intent requirement no longer remains applicable.  Contrary to the majority's assertion, nothing about applying the shocks-the-conscience standard would "impose[] strict liability" and "hold[] a government actor automatically responsible for incidental harms flowing from his actions." Majority Op. at 6.  They would face liability only when their conduct shocks the conscience—

"a tough test" "[t]o say the least," *id.* at 4—and when they caused the plaintiff's injury, *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007). Further, that other circuit courts followed *Trujillo* is not a reason to adopt an outdated and moot requirement.

In addition to the fact that there no longer remains a need for a "logical stopping place for" such due-process claims, *Trujillo*, 768 F.2d at 1190, the requirement that the official's "intent or the decision itself be[] aimed at the family relationship," Majority Op. at 10, is arbitrary. I offer an example to highlight the arbitrariness of this requirement. A police officer, angry that their child is bullied in school, chooses to punish their child's bully, so the police officer deliberately and wrongfully frames their parent for murder and incarcerates the bully's parent for thirty-two years. The majority, I presume, would consider this to be a violation of the child's right to family association and integrity. This example, of course, presents the exact same misconduct and injury alleged by the Chambers brothers. There is only one difference that, according to the majority, makes these circumstances constitutionally distinguishable—the officer's motive for *why* they destroyed the family unit—despite the same bad-faith investigation and persisting with the wrongful conviction while knowing with substantial certainty the deprivation that would result. "Appropriate limits on substantive due process come not from drawing arbitrary lines but rather from careful 'respect for the teachings of history [and] solid recognition of the basic values that underlie our society.'" *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (alteration in original) (quoting *Griswold v. Connecticut*, 381 U.S. 479, 501 (1968) (Harlan, J., concurring)).

The majority cites several cases concerning the right to family association and says that these cases involve "state actions directed at the family relationship . . . or state regulation of decisions within the ambit of parental control," or in the case of *Moore*, the extended family. Majority Op. at 4 (collecting cases). It lists, as examples, "educational decisions, the choice of living arrangements, and the choice to have children." *Id.* But by deliberately procuring the wrongful conviction of Appellants' father despite knowing of his innocence, the state, here too, interfered with parental decisions regarding education, living arrangements, the size of the family, and custody. Having inflicted these same injuries on Appellants' family, that Detective Sanders may have had other or additional motivations for his conduct, I believe, is not of

constitutional significance when he intentionally or knowingly procured this result.  I simply fail to see how intentionally procuring a wrongful conviction and incarcerating a father for thirty-two years is not an intrusion into the decision to have a parent involved in their child's education, *Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923); the "choice[] concerning [the] family living arrangement[]," *Moore*, 431 U.S. at 499; and the parental-custody arrangement, *see Troxel v. Granville*, 530 U.S. 57, 68–69, 72–73 (2000).

The majority's next basis for its decision, some published "analogous cases" in the Sixth Circuit, also fails to support its new requirement.  I find little analogy in these cases as they considered whether a plaintiff can bring a § 1983 claim to remedy the state's deprivation of *a family member's* rights.  In *Jaco v. Bloechle*, 739 F.2d 239, 240 (6th Cir. 1984), we considered a mother's § 1983 claim wherein the mother alleged "violations of the *decedent's* civil rights" and requested relief for "compensation under Ohio's wrongful death statute."  *Id.* (emphasis added).  Because the mother argued that her *son's* constitutional rights had been deprived—not hers—we explained that "[b]y its own terminology, [§ 1983] grants the cause of action 'to the party injured[]' [and a]ccordingly, it is an action *personal* to the injured party."  *Id.* at 241 (quoting 42 U.S.C. § 1983).  In *Purnell v. City of Akron*, 925 F.2d 941 (6th Cir. 1991), we considered "a survival action based on the violation of *decedent's* constitutional rights by defendants" brought under § 1983 that sought "damages only for a violation of *[the decedent]'s* constitutional rights" and a second claim brought under Ohio's wrongful death statute.  *Id.* at 943, 948 (first emphasis added).[2]

Similarly, in *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000), we focused only on causes of action brought in the plaintiffs' *representative capacity* that alleged the deprivation of their decedent-father's constitutional rights.  We interpreted the action as one in which plaintiffs sued as "heirs at law" in both counts one and two regarding defendants' "violat[ion of] the civil rights [of the decedent]" and stated that "[Plaintiffs] adequately requested compensation for [the decedent's] alleged constitutional injuries in their representative capacities as co-administrators

---

[2]We "d[id] not address the merits of the difficult question of whether the children of [the decedent] . . . could state a claim for damages under section 1983 based on the killing of their father."  *Purnell*, 925 F.2d at 948 n.6.

of his estate." *Id.* at 356–57. Thus, our statement that "a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort" reflects that procedural posture and firmly squares with instances in which a plaintiff's § 1983 claim does not allege a violation of their own constitutional rights but rather seeks redress only for a violation of another individual's constitutional rights. *See id.* at 357. That is why we instructed that "only the purported victim, or his estate's representative(s), may prosecute a section 1983 claim." *See id.* *Claybrook*'s dicta that "no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members," *id.*, must also be read in the context of the procedural posture and claims asserted before the *Claybrook* court. Having read the complaint to seek redress of only the decedent's *constitutional* injury, not the plaintiffs', *Claybrook* determined that "the amended complaint['s] alleg[ations] . . . [stating] that '[a]s a result of the wrongful acts of the defendants, plaintiffs . . . incurred medical and funeral expenses, as well as great emotional loss associated with the wrongful death of their father,'" were not redressable under § 1983. *See id.* at 356–57 (final alteration in original). These injuries, as alleged, were not a deprivation of rights secured by the Constitution or laws of the United States. *See id. Claybrook* neither defines the scope of the constitutional right nor precludes a plaintiff from bringing a § 1983 claim to redress *their own constitutional injuries* merely because those injuries intertwine with another family member's injury. *See Ghaith v. Rauschenberger*, 493 F. App'x 731, 739 (6th Cir. 2012) ("A state may not interfere with this liberty interest, and indeed the violation of the right to family integrity is subject to remedy under § 1983." (quoting *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011)).[3]

## IV. APPLYING THE SHOCKS-THE-CONSCIENCE STANDARD

I would hold that Appellees' conduct shocks the conscience. Substantive due process affords "freedom from government actions that 'shock the conscience.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir.

---

[3]*See also Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (explaining "[i]t is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child . . . [that] extends to protect children from unwarranted state interference with their relationships with their parents" and is redressable under § 1983 (internal quotations omitted)).

2003)). The doctrine, at its core, protects against arbitrary government action—"government power arbitrarily and oppressively exercised." *Lewis*, 523 U.S. at 846.

Courts have found that an officer's conduct in both criminal and child-protective-services-investigations[4] could shock the conscience and, in some instances, deprive a plaintiff of their due-process right to familial association. *See Ghaith*, 493 F. App'x at 739 (considering whether criminal investigation deprived plaintiff of right to family association); *Kottmyer*, 436 F.3d at 690–91, 691 n.1 (considering whether child-protective-services investigation deprived parents of right to family association); *Kolley v. Adult Protective Servs.*, 725 F.3d 581, 585–86 (6th Cir. 2013) (same); *Heithcock v. Tenn. Dep't of Child.'s Servs.*, No. 15-6236, 2016 WL 11786416, at *1–2, *4 (6th Cir. 2016) (order) (same). Allegations of a bad-faith investigation are particularly important in this determination. *See Heithcock*, 2016 WL 11786416, at *1–2, *4. Courts have also examined whether deliberately procuring a wrongful conviction against someone shocks the conscience. *See, e.g.*, *Winslow v. Smith*, 696 F.3d 716, 731, 736 (8th Cir. 2012). Another court has also determined that an "unwarranted state interference" with the protected relationship between parent and child occurred when the police extradited the wrong person from Los Angeles to New York, where they were wrongfully incarcerated for two years. *See Lee*, 250 F.3d at 685; *see also id.* at 677–78, 686. The wrongful extradition and incarceration violated the incarcerated-individual's mother's right to family association and integrity. *See id.* at 685–86.

An official's acts that "violate[] the 'decencies of civilized conduct'" shock the conscience. *Lewis*, 523 U.S. at 846 (quoting *Rochin v. California*, 342 U.S. 165, 172–73 (1952)). "Such conduct includes actions 'so brutal and offensive that [they do] not comport with

---

[4]In child-protective-services cases, though "[m]ere investigation by authorities into child abuse allegations without more . . . does not infringe upon a parent's right to custody or control of a child," an exception exists when "the investigation was undertaken in bad faith or with a malicious motive or if tactics used to investigate would 'shock the conscience.'" *Kottmyer*, 436 F.3d at 690–91, 691 n.1; *Kolley v. Adult Protective Servs.*, 725 F.3d 581, 585 (6th Cir. 2013) ("[A] government investigation of child abuse will not automatically implicate the right to familial association absent 'evidence of bad faith, improper motive, or investigation tactics that shock the conscience.'" (citation omitted) (quoting *Teets v. Cuyahoga County*, 460 F. App'x 498, 502 (6th Cir. 2012)). In *Heithcock v. Tennessee Department of Children's Services*, No. 15-6236, 2016 WL 11786416, at *1–2, *4 (6th Cir. 2016) (order), we applied this principle and held that because the plaintiff alleged that a child-protective-services employee conducted the investigation in bad faith depriving her of her right to family association, the district court erred by granting the defendant qualified immunity.

traditional ideas of fair play and decency.'" *Range*, 763 F.3d at 589–90 (alteration in original) (quoting *Lewis*, 523 U.S. at 847). Conscience-shocking conduct is "arbitrary in the constitutional sense." *Lewis*, 523 U.S. at 846 (quoting *Collins v. Harker Heights,* 503 U.S. 115, 129 (1992)). "[T]he 'shocks the conscience' standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation." *Range*, 763 F.3d at 590 (quoting *Lewis*, 523 U.S. at 847–48).

We have offered a spectrum of conduct to guide our conscience-shocking inquiry. "The bookends present the easier cases. Merely negligent tortious conduct is categorically beneath constitutional due process, but conduct on the other extreme end of the culpability spectrum, that which is 'intended to injure' without any justifiable government interest, most clearly rises to the 'conscience-shocking' level." *Id.* (quoting *Lewis*, 523 U.S. at 849). Conduct that is "something more than negligence but less than intentional conduct" and more akin to gross negligence, *Guertin v. State*, 912 F.3d 907, 923 (6th Cir. 2019) (quoting *Lewis*, 523 U.S. at 849), "recklessness or gross recklessness, such as deliberate indifference" falls in the middle, *Range*, 763 F.3d at 590. Whether this conduct shocks the conscience "depend[s] on the context." *Range*, 763 F.3d at 590 (quoting *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th Cir. 2008)).

When we consider the middle of the spectrum to determine deliberate indifference, we examine "a multitude of considerations when evaluating an official's alleged arbitrariness in the constitutional sense, including the time for deliberation, the nature of the relationship between the government and the plaintiff, and whether a legitimate government purpose motivated the official's act." *Guertin*, 912 F.3d at 924 ("These factors help elucidate *Lewis*'s broader point that simply making bad choices does not rise to the level of deliberate indifference."). Critical to our analysis of deliberate indifference is "whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Range*, 763 F.3d at 590 (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)). We have highlighted that though "a police officer who exhibits a reckless disregard for life during a high-speed chase does not shock the conscience because the circumstances require instant judgment," on the other hand "an officer who has five hours to decide whether to use tear gas and forced entry during a

standoff might shock the conscience if the officer is deliberately indifferent to the risks posed to hostages." *Id.* We consider, among other things, the amount of time for deliberation when "determining whether the actor's culpability 'inch[es] close enough to harmful purpose to spark the shock that implicates' substantive due process." *Id.* at 590–91 (alteration in original) (quoting *Lewis*, 523 U.S. at 853) ("For assessing whether conduct indicates harmful purpose and, thus, constitutional culpability, both the substance of the risk and the time the official had to appreciate it matter.").

Here, in determining whether to apply the shocks-the-conscience standard to Appellants' claim, both *Range* and this majority's emphasis on the word "plaintiff's" when citing *Range*, Majority Op. at 10, are illuminating. In *Range,* we stated that "[a] government actor who has time to deliberate shocks the conscience if the actions 'were taken with deliberate indifference towards the *plaintiff's* federally protected rights.'" 763 F.3d at 591 (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001)) (emphasis added). The plaintiffs in *Range* were, in fact, the family members of a deceased woman who had been sexually abused after her death by a morgue attendant. *Id.* at 578. On appeal, we considered the family's substantive-due-process claims against county officials who allegedly knew or had reason to know of the morgue attendant's sexual abuse of deceased women at the morgue. *Id.* at 578–79. We applied the shocks-the-conscience standard to determine whether the county officials' conduct violated the *family members'* substantive-due-process rights. *Id.* at 589–91. We therefore examined the full scope of the county officials' conduct; we considered "the type of harm, the level of risk of the harm occurring, and the time available to consider the risk of harm . . . [to] determine[e] whether [the] official[s] w[ere] deliberately indifferent." *See id.* at 591. We ultimately determined that insufficient evidence existed at the summary-judgment stage to reasonably infer that the county officials "acted with indifference towards the rights of the *families involved*." *Id.* (emphasis added).

Here too, I would examine the full scope of Sanders's conduct to evaluate the claim that he deprived Appellants of their rights to family association and integrity. Considering Appellants' allegations as true, as we must, I believe that Appellants adequately alleged that Sanders's conduct shocks the conscience. They allege that Sanders and the City acted

"intentionally, . . . purposefully, . . . recklessly, deliberately, maliciously, knowingly, carelessly, [and] with gross negligence" when conducting the investigation that caused the decades-long separation between them and their father. R. 1 (Compl. ¶ 8) (Page ID #2–3). They demonstrate as much by alleging a grotesque scheme by Appellees to threaten, intimidate, coerce, and mentally, emotionally, and physically abuse Burton and numerous witnesses during the criminal investigation; to fabricate evidence; and to suppress exculpatory evidence demonstrating Burton's innocence. *Id.* ¶¶ 16–25, 28–41, 49–65 (Page ID #4–14).

The risks and consequences of physically, mentally, and emotionally abusing witnesses to obtain false statements and testimony, fabricating evidence, and refusing to turn over exculpatory evidence in order wrongfully to convict an innocent person and deprive them of their family—and necessarily deprive their family of them—are self-apparent and extreme. And Gilchrist's testimony of Sanders's threats of incarceration to deprive her of her family further demonstrate Sanders's understanding and appreciation of these risks. Further, Sanders had months between Ruffin's death and Burton's trial "to deliberate" and "fully consider the potential consequences of [his] conduct," but Sanders stayed the course. *See Range*, 763 F.3d at 590–91 (quoting *Ewolski*, 287 F.3d at 510); R. 1 (Compl. ¶¶ 9–10) (Page ID #3). In fact, Sanders's and the City's alleged heinous behavior persisted during the trial when an officer "kept [a fourteen-year-old witness] in a room over night to stop her from testifying at trial, knowing that she would contradict the prosecution's theory of the case" by "testif[ying] that Mr. Burton did not commit the crime." R. 1 (Compl. ¶ 24) (Page ID #6); *see also* R. 1-9 (Compl., Ex. 9 at 2–3) (Page ID #50–51). Police also "punched and threatened" another witness during trial "to make [the witness] change [their] testimony." R. 1-8 (Compl., Ex. 8 at 1) (Page ID #47).

Other courts considering similarly abhorrent criminal investigations involving fabricated evidence and the suppression of exculpatory evidence found the conduct conscience shocking. *See, e.g.*, *Winslow*, 696 F.3d at 731–36 (reviewing plaintiffs' claims that law enforcement deprived them of their due-process liberty interest in a fair criminal proceeding by recklessly investigating and fabricating evidence in a rape and murder investigation causing them to plead guilty to crimes they had not committed). Law enforcement's decision to "ignore[] exonerating evidence," *id.* at 731, "systematically coach[] witnesses into providing false testimony that was

in line with the narrative of [law enforcements]'s theory as to how the murder had been committed," *id.* at 732–33, "exert pressure on vulnerable witnesses to provide testimony that was not within those witnesses' personal memory," *id.* at 735, and "campaign to manufacture evidence to implicate" the suspects, *id.* at 734, shocked the conscience, *id.* at 736.

The extent of brutality and malfeasance alleged here differs substantially from the kind of deficient government investigations that do not shock the conscience. *See, e.g.*, *Palmer v. Adams*, 517 F. App'x 308, 310–11 (6th Cir. 2013) (finding failures to interview certain witnesses, consider results of medical examination, and consider certain statements not to shock the conscience in child-protective-services case); *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009) (finding criminal investigation did not shock the conscience because there was no evidence that law enforcement "purposefully ignored evidence suggesting [the accused's] innocence," "intended to misconstrue the evidence against [the accused]," or "was pressured to implicate [the accused] or to improperly strengthen the state's case against him").

Sanders engaged in conscience-shocking conduct when he intentionally and deliberately procured a wrongful conviction that incarcerated Appellants' father for thirty-two years, directly depriving Appellants of their family association. It does not matter that Sanders's primary motivation may not have been to harm the relationship. Thus, I would hold that Sanders violated Appellants' rights to family association and integrity because his conduct shocks the conscience.

## V. EVEN UNDER THE MAJORITY'S TEST, APPELLANTS SHOULD PREVAIL BECAUSE THEY SUFFICIENTLY PLEADED THAT SANDERS'S CONDUCT WAS DIRECTED AT THE FAMILY RELATIONSHIP

I would perhaps agree with the majority that many "incidental harms," Majority Op. at 6, on the family relationship arising from "routine interaction[s]," *id.* at 5, between government officials and a family member do not amount to a due-process violation. I, however, find nothing about the allegations in this case to be "routine" and nothing about Sanders's conduct to be "incidental." And I fail to see how deliberately and wrongfully incarcerating a father for the duration of his life is not a "decision . . . aimed at the family relationship." *Id.* at 10. As I note above, I believe that the panel can reasonably infer that Sanders knew that the Burton had

children[5] and knew that incarcerating him for the duration of his life would result in the destruction of their family unit. These inferences, alongside the intentional, deliberate, and knowing conduct of Detective Sanders, supply enough support to overcome a motion to dismiss regarding whether Sanders "acted with a culpable state of mind directed at the plaintiff's family relationship or a decision traditionally within the ambit of the family." *Id.* at 10.

Despite knowing that deliberately and wrongfully incarcerating Burton would deprive his children of their father for the remainder of his life, Detective Sanders nonetheless took actions to carry out that consequence. As the Restatement of Torts instructs, a person acts with intent when they desire to or have the purpose of bringing about certain consequences or when they "act[] knowing that the consequence is substantially certain to result." Restatement (Third) of Torts: Phys. & Emo. Harm § 1 & cmts. a–c (Am. L. Inst. 2010).[6] The majority believes that "[a] government official can make a wrongful, intentional decision . . . without that intent or the decision itself being aimed at the family relationship." Majority Op. at 10. It "requires that the state actor act with a culpable state of mind with respect to the plaintiffs themselves and their own alleged constitutional rights." *Id.* That Sanders may have had other motivations while doing so does not negate that he "act[ed] knowing that the consequence" of destroying the family unit "[wa]s substantially certain to result," Restatement (Third) of Torts § 1(b),[7] yet affirmatively proceeded to do so anyway. Under these circumstances, I believe that the law should treat Sanders as having "acted with a culpable state of mind directed at the plaintiff's family relationship or a decision traditionally within the ambit of the family." Majority Op. at 10. And we should remember that Appellants allege that Sanders targeted their family. R. 1 (Compl. ¶ 31) (Page ID #8).

---

[5]To the extent the majority believes that it is necessary for Sanders to know that Burton had children before finding that his decision to separate Burton from the family violated Appellants' constitutional rights, I believe Appellants should be entitled to discovery on this point.

[6]*See also* Restatement (Second) of Torts § 8A & cmt. b (Am. L. Inst. 1965) (explaining that when "the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result").

[7]*See also* Restatement (Third) of Torts § 1 cmts. a–c; Restatement (Second) of Torts § 8A & cmt. b.that

## VI. CONCLUSION

Only by "clos[ing] our eyes to the basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause," could we "avoid applying the force and rationale of [our] precedents to the family choice[s]" and the family unit taken from the Appellants. *See Moore*, 431 U.S. at 501 (rejecting the attempt to distinguish other precedents because of differences in certain facts before the Court). The "caution and restraint" required of us when considering substantive-due-process rights "does not counsel abandonment . . . [or] cutting off any protection of family rights at the first convenient, if not arbitrary boundary." *Id.* at 502. I would have exercised this "caution and restraint" differently. I would therefore reverse and remand to the district court for further consideration of Appellants' claims.