RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0024p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JOSHUA STEEB,

                 *Plaintiff-Appellant*,

    *v.*

MIKE EHART, in his individual and official capacities; CITY OF BATTLE CREEK, MICHIGAN, jointly and severally,

                 *Defendants-Appellees*.

No. 24-1936

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:24-cv-00178—Hala Y. Jarbou, District Judge.

Argued:  July 30, 2025

Decided and Filed:  January 26, 2026

Before:  CLAY, GILMAN, and BLOOMEKATZ, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Jeffrey L. Herron, HERRON LAW FIRM, Detroit, Michigan, for Appellant. Patrick J. Batterson, CITY OF BATTLE CREEK, Battle Creek, Michigan, for Appellees. **ON BRIEF:** Jeffrey L. Herron, HERRON LAW FIRM, Detroit, Michigan, for Appellant. Patrick J. Batterson, CITY OF BATTLE CREEK, Battle Creek, Michigan, for Appellees.

     BLOOMEKATZ, J., delivered the opinion of the court in which GILMAN, J., concurred. CLAY, J. (pp. 11–23), delivered a separate dissenting opinion.

---

**OPINION**

---

BLOOMEKATZ, Circuit Judge.  Joshua Steeb rescued his friend from a dog attack, but then the dog turned on him, mauling him and causing permanent injuries.  To redress these injuries, he brought a claim against Battle Creek animal control officer Mike Ehart under the "state-created-danger" theory of substantive due process, alleging that Ehart created the dangerous circumstances that resulted in the dog attack.  He also sued the City of Battle Creek for failure to adequately train and equip Officer Ehart.  The district court dismissed both of Steeb's claims for failure to successfully plead a constitutional violation.  We agree and affirm.

**BACKGROUND**

This case comes to us at the motion to dismiss stage, so we recite the facts as alleged in the complaint.  *Thomas v. Montgomery*, 140 F.4th 335, 337 (6th Cir. 2025).

Joshua Steeb and his friend, Teresa Fitzgerald, drove to the home of Fitzgerald's relative, Linda Motter, to help facilitate the removal of a dog in Motter's care.  The "large, dangerous dog" had previously been quarantined by local officials.  Compl., R. 1, PageID 3.  It had also bitten Steeb on a prior occasion and acted aggressively toward him in the past.  At Motter's request, Fitzgerald called 911 to report the dog as dangerous and request its removal.  While Motter waited in her home with the dog, Fitzgerald and Steeb remained inside Steeb's car, which was parked in Motter's driveway.

Shortly thereafter, Officer Mike Ehart, a Battle Creek animal control officer and employee of the Battle Creek Police Department, arrived on the scene in a pickup truck.  Officer Ehart "was personally aware of the dog's violent history and how difficult it was to control the dog" because he had delivered the dog back to Motter's home after it was previously quarantined.  *Id.* at PageID 4.  So, when he arrived on the scene, Officer Ehart "was aware of the dangers the dog presented" and knew that "[t]he dog was large and strong and easily capable of overwhelming both Fitzgerald and Steeb."  *Id.* at PageID 6.

Despite his previous interaction with the dog, Officer Ehart "asked Fitzgerald to remove the dog" from Motter's home and place it into a containment area that had been installed in the bed of the pick-up truck. *Id.* Meanwhile, he "would wait in the safety of the truck's cab." *Id.* Fitzgerald "expressed apprehension" about retrieving the dog from the house, and, at the time, there was no apparent "immediacy" requiring the dog to be removed from the security of Motter's home without considering other options, calling for back-up, or otherwise retrieving the dog without Fitzgerald's involvement. *Id.* at PageID 5–6. Nonetheless, Officer Ehart "insisted she proceed with securing the dog into the truck." *Id.* at PageID 6.

Officer Ehart "briefly exited the truck" to show Fitzgerald how to close the gate to the containment area once the dog was inside. *Id.* at PageID 7. To secure the gate-closure mechanism with the dog inside, Fitzgerald would have to place her head "at or near the same level as the dog's mouth and jaws, mere feet away." *Id.* Thus, Officer Ehart knew the "imminent danger" that Fitzgerald would face in attempting to secure the dog in the containment area, yet he did not tranquilize the dog prior to its removal or provide Fitzgerald with any tools—such as a catchpole—that would allow her to control the dog. *Id.* After the demonstration, Officer Ehart returned "to the safety of the cab" and remained there while Fitzgerald attempted to coax the dog toward the truck and into the containment area. *Id.* at PageID 8.

As Fitzgerald attempted to coax the dog toward Officer Ehart's truck, it viciously "attacked [Fitzgerald], knocking her to the ground" and "biting and mauling her." *Id.* at PageID 8. Steeb then exited his car and struck the dog with a wooden axe handle, attempting to rescue Fitzgerald. This diverted the dog's focus on Fitzgerald, and it instead turned toward Steeb. The dog bit and clamped onto Steeb's leg, refusing to release him.

At this point, Officer Ehart exited his truck. Steeb asked Officer Ehart to kill the dog, but Ehart was unarmed because Battle Creek had never issued him a firearm despite his repeated requests. Officer Ehart shouted that "he did not know what to do," and Steeb replied that Ehart should call for backup, which he did. They waited for backup with the dog "clamping and re-clamping" on Steeb's leg. *Id.* at PageID 10. When a police officer arrived on the scene, he shot and killed the dog. Steeb and Fitzgerald were both brought to a hospital, where Steeb underwent multiple surgeries and was informed that the doctors might need to amputate his leg. Although

Steeb ultimately did not lose his leg, his injury caused "substantial orthopedic and tissue injury," and he suffers from "severe pain, permanent disfigurement and permanent limited mobility." *Id.* at PageID 11.

Steeb sued Officer Ehart and the City of Battle Creek under 28 U.S.C. § 1983. Pursuing a theory of "state-created danger," he alleged that Officer Ehart violated Steeb's substantive due process rights under the Fourteenth Amendment by insisting that Fitzgerald retrieve the dangerous dog, thus exposing Fitzgerald—and by extension Steeb, as a likely rescuer—to foreseeable harm. Steeb also alleged that Battle Creek was vicariously liable for Officer Ehart's constitutional violations because of its failure to adequately train, supervise, and equip Ehart. Finally, he alleged that Officer Ehart and Battle Creek were both liable under Michigan tort law.

Both Officer Ehart and Battle Creek moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Ehart's actions did not rise to the level of a constitutional violation. Officer Ehart also asserted qualified immunity.

The district court agreed with the defendants. Having dismissed all the federal claims, the district court declined to exercise supplemental jurisdiction over Steeb's state law claims and dismissed those without prejudice. Steeb brought this timely appeal.

**ANALYSIS**

## I.       Standard of Review

We review de novo the district court's decision to grant a motion to dismiss under Rule 12(b)(6). *Peterson v. Johnson*, 87 F.4th 833, 836 (6th Cir. 2023). In reviewing Steeb's complaint, we accept all well-pleaded factual allegations as true and draw all reasonable inferences in his favor. *Jackson v. City of Cleveland*, 64 F.4th 736, 743 (6th Cir. 2023). Then, if the facts as alleged do not state a plausible claim for relief, the complaint should be dismissed. *Newberry v. Silverman*, 789 F.3d 636, 640 (6th Cir. 2015).

## II.      Steeb's Substantive Due Process Claim Against Officer Ehart

Steeb argues that Officer Ehart violated his substantive due process rights under the Fourteenth Amendment by placing him at risk of being attacked by the dog. Although we do not

diminish the "tragic facts" giving rise to his injuries, we agree with the district court that Steeb has not met the high bar for bringing a constitutional claim under these circumstances, and "respectfully reaffirm that the Constitution does not empower federal judges to remedy every situation we find 'heart-wrenching.'" *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 928 (6th Cir. 2020) (quoting *Schroder v. City of Fort Thomas*, 412 F.3d 724, 725 (6th Cir. 2005)).

In pursuing this constitutional claim, Steeb proceeds under a line of our cases where we have recognized a "state-created-danger" theory. Under this theory, state officials can, in specific circumstances, be liable for harms caused by third parties. *Id.* at 932–33. Steeb invokes this theory because Officer Ehart did not harm him directly—the dog (a third party) caused his injuries. The Constitution does not typically require the state to protect individuals from private acts of violence or harm, *see Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989), and we have also recognized that substantive due process has been increasingly questioned as a doctrine, *see, e.g.*, *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 472–73 (6th Cir. 2023). But rooted in our binding precedent is "an exception" to the general "rule that a state has no constitutional duty to protect individuals who are not in its custody." *Jane Doe*, 954 F.3d at 932. Under our law, when a state officer affirmatively "create[s] or increase[s] the risk that an individual will be exposed to private acts of violence" and that risk materializes, the individual can hold the officer liable under the Due Process Clause of the Fourteenth Amendment. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998).

To successfully plead substantive due process liability via the "state-created-danger doctrine," a plaintiff must make three showings. *McQueen v. Beecher Cnty. Schs.*, 433 F.3d 460, 463 (6th Cir. 2006). *First*, that the state actor took "an affirmative act that create[d] or increase[d] the risk" that the plaintiff would experience private acts of violence. *Id.* at 464. *Second*, that the risk was "special" to the plaintiff "as distinguished from the public at large." *Id.* And, *third*, that the state actor "acted with the requisite culpability." *Id.* at 469 (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)). Because Steeb failed to demonstrate the first element—that Officer Ehart took an "affirmative act" as defined by our precedents—we do not need to resolve whether he satisfied the other elements.

For the "affirmative act" element in state-created-danger claims, we ask whether the officer's action "directly increase[d] the vulnerability of citizens to danger" by a third-party. *Ewolski*, 287 F.3d at 509. This inquiry "is not predicated upon but-for causation; rather it is more akin to the notion of proximate causation." *Barber v. Overton*, 496 F.3d 449, 454 (6th Cir. 2007). And because we require the officer's action to "*directly* increase" the risk of harm, *Ewolski*, 287 F.3d at 509 (emphasis added), intervening causes can disrupt the chain of causation. Accordingly, we have repeatedly asked whether the officer "created the risk of harm to the plaintiff without the consent of the victim." *Summar ex rel. Summar v. Bennett*, 157 F.3d 1054, 1058 (6th Cir. 1998).

When the victim consented or voluntarily assumed the risk of the harm that the officer has allegedly created, then the officer's purported "affirmative act" is insufficient to give rise to liability under our state-created-danger precedents. Comparing two of our cases—*Nelson v. City of Madison Heights*, 845 F.3d 695 (6th Cir. 2017), and *Summar*—illustrates this point. In both cases, an individual agreed to serve as a confidential informant to avoid drug charges. Then, after the police revealed the informant's identity, they were killed, presumably by the criminal gangs involved in the prosecutions that the informants aided. *See Nelson*, 845 F.3d at 698–99; *Summar*, 157 F.3d at 1056. Yet the cases led to different outcomes. In *Summar*, the informant had chosen to help the police "despite being advised that he would have to testify and reveal his status as an agent of the police." *Summar*, 157 F.3d at 1058. Given the plaintiff's "voluntary decision" to be an informant "with all the dangers it presented," we held that the official defendants were not liable for taking an affirmative act that substantially increased the likelihood of harm from a third party. *Id.* at 1059 n.2. Conversely, in *Nelson*, we held that the police had taken an affirmative act that endangered the informant because she never agreed to testify or otherwise reveal her identity. 845 F.3d at 700–01. We emphasized that, "unlike the facts in *Summar*," in *Nelson* the deceased's "voluntary election to serve as a confidential informant did not come with conditions that would have put her on notice that her identity would eventually become public." *Id.* at 700; *see also Kallstrom*, 136 F.3d at 1059, 1067 (holding that municipal defendants could be liable for harm resulting from "affirmatively releasing" undercover officers' names and addresses, despite promising they would be "held in strict confidence"). The critical distinction is that, in *Summar*, the informant had voluntarily assumed the risk that his name

would be revealed, whereas in *Nelson*, the informant had not.  Thus, in *Nelson*, the police could be liable under the state-created-danger theory, but in *Summar*, the theory failed as a matter of law.

Applying these cases here, we conclude that Steeb has failed to plead an affirmative act sufficient to invoke the state-created-danger doctrine.  Most critically, Fitzgerald voluntarily assumed the risk of a dog attack when she attempted to coax the dog out of Motter's home.  Consider, again, the alleged facts construed in the light most favorable to Steeb.  Officer Ehart and Fitzgerald both knew the dog was dangerous.  And as she and Officer Ehart discussed how to proceed, "the dog was secured inside [the] house."  Compl., R.1, PageID 5.  Thus, "[t]here was no immediacy requiring" them "to act quickly" because they "had ample time to consider options."  *Id.*  Despite this relative safety, Officer Ehart "asked" Fitzgerald to retrieve the dog from the house and secure it in his truck and later "insisted" she do so.  *Id.* at PageID 6.  Even drawing all factual inferences in Steeb's favor, Fitzgerald could have chosen not to follow Officer Ehart's plan.

Because Fitzgerald understood that the dog might well attack her, but still agreed to retrieve it, she voluntarily assumed this risk.  When the dog in fact attacked her, Steeb tried to intervene, and the dog mauled him too.  But due to Fitzgerald's knowing choice, the tragic circumstances alleged in the complaint fall short under our precedents of plausibly alleging that Officer Ehart's actions directly caused the risk that led to Steeb's injuries.[1]

Steeb nevertheless contends that two facts demonstrate that Officer Ehart affirmatively caused his harm, but we are unpersuaded.  *First*, he emphasizes that Officer Ehart "insisted" that Fitzgerald retrieve the dog.  *Id.*  But that allegation does not transform Fitzgerald's decision to attempt to coax the dog from Motter's home into an involuntary one.  Even based on Steeb's own allegations, Officer Ehart never "ordered" or "command[ed]," Fitzgerald to transfer the dog.  *See* Dis. Op. at 13, 14. Officer Ehart might well have "insisted," but it was still a request from an

---

[1]Steeb frames the case as one in which Officer Ehart affirmatively acted to put Fitzgerald in danger and, by extension, placed Steeb in danger as a foreseeable rescuer.  We follow his framing and because, as we have explained, the allegations of an "affirmative act" are insufficient as to Fitzgerald, so too for Steeb.  But Officer Ehart acted affirmatively even less directly as to Steeb himself.  And even if we framed the case in that way, Fitzgerald's voluntary action still disrupted the causal chain as an intervening act.

unarmed officer with no apparent authority to arrest or otherwise discipline Fitzgerald if she refused.

Moreover, Officer Ehart's insistence that Fitzgerald remove the dog does not differentiate this case from *Summar*, where we said the decedent had voluntarily assumed the risk of harm despite the officer's actions. 157 F.3d at 1058. Just as Officer Ehart first "asked" Fitzgerald to contain the dog, the officer in *Summar* first "asked" the decedent to serve as a confidential informant. *Id.* at 1056. Both Fitzgerald and the decedent in *Summar*, despite their initial "reluctance," ultimately "agreed to assist." *Id.* In *Summar*, the decedent faced prosecution and possible jail time if he did not agree to be a confidential informant, so he faced a tough choice. Yet we still held in *Summar* that the decedent "voluntarily" assumed the risks of cooperating with the police and agreeing to testify in court because the officer "did not impose any constraint on [the informant's] freedom to act." *Id.* at 1058–59 (citation modified). The circumstances here are even less coercive because Officer Ehart had no authority over Fitzgerald, let alone the power to send her to jail if she did not agree. Given that we held that the decedent's decision to be a confidential informant and testify publicly in *Summar* was sufficiently voluntarily to defeat the affirmative act element, it follows that we do here too.

We also cannot differentiate *Summar* based on how much (or little) Fitzgerald knew when she agreed to remove the dog from the house, as the dissent suggests. Dis. Op. at 16–17. The allegations do not support the dissent's contention that "Fitzgerald was not aware of and thus did not voluntarily assume the risks . . . of wrangling the dog." *Id.* at 16. To the contrary, the record shows that Fitzgerald was well-aware of the risks and nevertheless voluntarily assumed them despite her initial reluctance. *See, e.g.*, Compl. R. 1, PageID 5–6 (noting that "Fitzgerald discussed the dangerous nature of the canine" and "told Ehart that she was afraid of the dog and did not trust it"). So, as in *Summar*, Fitzgerald broadly knew about the possible dangers her decision might expose her to, even if Officer Ehart did not specifically "appraise[]" her of the "associated risks." Dis. Op. at 15. And even if she acted "on the very reasonable assumption that Ehart was properly equipped with a weapon and would come to her—or her friend's—aid if the dog attacked," *id.* at 16, she still knew there was a risk that she could be harmed by the dog because Officer Ehart could have at best only mitigated the harm that would

have already been inflicted if the dog attacked.  Thus, whether Fitzgerald knew "that Ehart would take virtually no steps to intervene once the dog attacked," *id.* at 17, does not alter the key point that her voluntary assumption of the risk broke the chain of causation necessary to support Steeb's substantive-due-process claim.

*Pagan v. Rivera*, a case out of the District of New Jersey and the primary authority on which Steeb relies, does not say otherwise.  No. 19-7176, 2020 WL 2060274 (D.N.J. Apr. 29, 2020).  There, the officer conceded for the sake of argument that he "affirmatively used his authority in such a way as to create a danger" by ordering a woman to enter a house where she knew her abusive husband waited inside.  *Id.* at *4.  Officer Ehart has not made that concession here.

*Second*, Steeb emphasizes that he and Fitzgerald were safer before Officer Ehart's intervention, demonstrating that Ehart affirmatively created the risky situation.  True, we have sometimes used this framing as a starting point for discussing whether officers' actions increased the risk of harm.  But relying on it alone here mistakes our affirmative act requirement for a but-for test.  In *Summar*, too, the decedent was safer before being asked to be a confidential informant than he was after agreeing.  However, neither the informant in *Summar* nor Fitzgerald here was forced to assume the risk.  So even though they were both in safer positions before the request than after agreeing to it, neither case satisfies the affirmative act requirement.

Officer Ehart, in sum, did not take "an affirmative act" that suffices under our existing precedents.  We therefore affirm the district court's dismissal of Steeb's constitutional claim against him.

## III.    Municipal Liability

Steeb also brought a municipal liability claim against Battle Creek.  Since the alleged facts do not rise to the level of a constitutional violation, the district court properly dismissed

Steeb's claim that the city was vicariously liable. *Chambers v. Sanders*, 63 F.4th 1092, 1101–02 (6th Cir. 2023).[2]

## CONCLUSION

For these reasons, we affirm the district court's dismissal of Steeb's constitutional claims against Officer Ehart and the City of Battle Creek.

---

[2]In Steeb's initial complaint, he also raised state tort law claims against Officer Ehart and Battle Creek. The district court declined to exercise supplemental jurisdiction over these claims once it had dismissed his federal law ones. Steeb does not contest this ruling on appeal, and we do not address it.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting. Plaintiff Joshua Steeb suffered grievous injuries because city-employed animal control officer Mike Ehart demanded that Steeb's friend, Teresa Fitzgerald, capture a violent dog and transfer it to Ehart's truck without any assistance from Ehart. Because I believe the Ehart acted with reckless disregard with respect to Fitzgerald and Steeb's safety, subjecting Steeb to extremely dangerous conditions in violation of his substantive due process rights, I respectfully dissent from the majority's decision to affirm the district court's dismissal of Steeb's complaint.

Although the majority opinion accurately recites the facts as alleged by Steeb, it bears reemphasizing the extent to which Ehart abdicated his responsibility to protect the public from dangerous animals and instead placed Steeb and Fitzgerald in peril's way. On February 22, 2021, Fitzgerald called 911 to ask authorities to remove a dangerous dog that had been abandoned by a family member and left in the care of Fitzerald's relative, Linda Motter. When Ehart arrived at the scene, the dog was safely contained inside Motter's home, and Fitzgerald and Steeb, who had accompanied Fitzgerald, were waiting outside the house.

Instead of undertaking to remove the dog himself, Ehart inexplicably instructed Fitzgerald to retrieve the dog alone and place it in the animal containment area of his truck. Ehart gave this instruction even though he had prior experience with the dog and was "personally aware of the dog's violent history and how difficult it was to control the dog." Compl., R.1, at Page ID #4. Fitzgerald had also personally discussed the dog's dangerous history with Ehart after he arrived at the scene, expressing her fear of the dog and her apprehension about removing it. Nonetheless, "Ehart insisted she proceed with securing the dog into [his] truck." *Id.* at Page ID #6. He offered Fitzgerald no special equipment to aid in the process and did not tranquilize the dog. Instead, Ehart "secur[ed] himself in the safety of the . . . truck while Fitzgerald"—a civilian untrained in animal control—"attempted to coax the dog out of the house." *Id.* at Page ID #7.

Unsurprisingly, the dog viciously attacked Fitzgerald.  Seeing the dog mauling his friend, Steeb exited the car in which he had been waiting and attempted to rescue Fitzgerald.  When Steeb intervened, the dog released Fitzgerald and turned on Steeb, proceeding to severely maul his leg.

At this point, Ehart finally exited his truck.  According to the complaint, the only equipment Ehart had with him was an "animal control loop," but that device was "useless to end the attack on Steeb as the dog had clamped onto Steeb's leg and would not release." *Id.* at Page ID #9.  As the dog continued its attack, Steeb asked Ehart to kill the dog, but Ehart was unarmed. Ultimately, Ehart did nothing to stop the attack besides call for backup.  Eventually, a patrol officer arrived and shot and killed the dog, ending the attack.  But for Steeb, it was too late: he suffered "substantial orthopedic and tissue injury," "permanent disfigurement," and "permanent limited mobility." *Id.* at Page ID #11.

Steeb filed suit against Ehart and the City of Battle Creek under 42 U.S.C. § 1983 arguing that they violated his substantive due process rights under the Fourteenth Amendment. The district court dismissed his lawsuit for failure to state a constitutional violation.  The majority agrees with the district court and holds that Ehart's actions and the effects thereof did not constitute a state-created danger.  I disagree.

The Substantive Due Process Clause protects individuals against government infringement of their personal security.  *EJS Props., LLC v. Toledo,* 698 F.3d 845, 855 (6th Cir. 2012); *Kallstrom v. Columbus,* 136 F.3d 1055, 1062–63 (6th Cir. 1998).  And based on the facts alleged in the complaint, I believe that Ehart's actions gave rise to a significant and grave state-created danger that seriously infringed upon Steeb's personal security, leaving him permanently maimed.  I would therefore hold that Steeb alleged a viable § 1983 claim and reverse the trial court's dismissal of his complaint.

## A.  Steeb's Claim Under the State-Created Danger Doctrine

Steeb alleges that Ehart violated his substantive due process rights when Ehart created a danger to Steeb by insisting that Fitzgerald remove the dog and then failing to respond to the dog's attack. Steeb contends that this increased the risk that Steeb himself would be attacked by

the dog and rendered foreseeable the need for Steeb to attempt to rescue Fitzgerald.  Because acts by third parties—in this case, the dog—generally do not violate the Due Process Clause, Steeb's claims depend on the state-created danger doctrine.  Specifically, Steeb prevails if he can prove that Ehart, as a government actor, created a danger to him.  *See Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008).

As the majority correctly states, "a plaintiff must allege the following three elements to show a violation of substantive due process under the state-created danger theory: (1) 'an affirmative act that creates or increases the risk,' (2) 'a special danger to the victim as distinguished from the public at large,' and (3) 'the requisite degree of state culpability.'"  *Smith v. City of Detroit*, 2024 WL 1931496, at *2 (6th Cir. May 2, 2024) (quoting *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 464 (6th Cir. 2006)).  In my view, however, the majority misapplies this test.  The majority ends its analysis at the first element, concluding that Steeb's state-created danger theory fails because Ehart failed to take an "affirmative act that create[d] or increase[d] the risk" to Steeb when he ordered Fitzgerald to take custody of and detain the dog without assistance.  *McQueen*, 433 F.3d at 464.

I believe that this conclusion is mistaken.  Ehart's insistence that Fitzgerald retrieve the dog unassisted directly caused the release of a violent dog who posed a grave danger to all bystanders—as is evidenced by the fact that both Steeb and Fitzgerald were attacked.  In addition, Ehart, who had been dispatched to provide specialized animal control assistance that civilians are incapable of performing, was unarmed and had no equipment that could contain an attacking dog.  Accordingly, when the dog did attack, Ehart could do nothing to intervene.  In short, Ehart's actions led to the release of a vicious dog that had been safely contained until his intervention and thus directly caused Steeb's mauling.  For the reasons explained in greater detail below, these facts are sufficient to allege a claim under the state-created danger doctrine, and I would reverse the district court's dismissal of Steeb's complaint.

### 1. Affirmative Act

To satisfy the first element of the state-created danger test, Steeb must plead sufficient facts alleging that Ehart took an affirmative act that "exposed [Steeb] to private acts of violence."

*Id.* Steeb must show not just that Ehart failed to act, but that Ehart took some action that actively increased the risk of danger to Steeb. *Lipman v. Budish*, 974 F.3d 726, 744 (6th Cir. 2020). In my view, Steeb has clearly made this showing.

In reaching this conclusion, I am guided by *McQueen v. Beecher Community Schools*. In that case, we held that it was not an affirmative act under the state-created danger doctrine when a teacher failed to act to prevent injury to her students when she left them unsupervised in a classroom where one student fatally shot another. *Id.* at 462–63. We were unable to find any evidence at summary judgment showing that the teacher's absence actually increased the risk to the deceased—it appeared that the shooting would have occurred irrespective of her presence in the classroom. *Id.* at 466.

In this case, by contrast, Steeb alleges exactly the sort of affirmative act on the part of Ehart that created a risk that did not exist prior to Ehart's actions. It is undisputed that it was Ehart's responsibility as the city's assigned animal control officer to take control of the animal and to safely remove it. When Ehart arrived at the scene, the dog was safely sequestered in Motter's home. And the facts in the complaint make clear that Fitzgerald would not have attempted to remove the dog on her own without Ehart's command to do so—after all, Fitzgerald called 911 in the first place specifically to avoid handling the dog without the assistance of a trained professional. In other words, the affirmative act that increased the risk to the victims that was lacking in *McQueen* is clearly present in this case: Steeb and Fitzgerald were "safer before" Ehart's order "than . . . after it" because Fitzgerald only undertook to remove the dog on her own based on Ehart's order to do so. *Lipman*, 974 F.3d at 744 (citation omitted). Ehart's instruction, followed by his refusal to intervene once the dog attacked, was thus the definitive action that imperiled Fitzerald and Steeb.

The majority does not appear to contest that Ehart's actions put in motion the chain of events that led to Steeb's mauling. Rather, they believe that Fitzgerald's decision to obey Ehart and retrieve the dog defeats Steeb's claim. The gravamen of the majority's argument is that Fitzgerald "consented" to and voluntarily assumed the risk of the harm presented by the dog, breaking the causal chain between Ehart's affirmative act and Steeb's injuries. The majority reaches this conclusion by comparing two cases in which confidential police informants were

killed by third parties after their identities became public. In the first case, *Summar ex rel. Summar v. Bennett*, the informant had chosen to help the police "despite being advised that he would have to testify and reveal his status as an agent of the police." 157 F.3d 1054, 1058 (6th Cir. 1998). In the second case, *Nelson v. City of Madison Heights*, the informant had never agreed to testify or otherwise reveal her identity. 845 F.3d 695 (6th Cir. 2017). In *Nelson*, we held that the police had taken an affirmative act that caused the victim's death because she never consented to the disclosure of her identity; in *Summar*, we held that the police's affirmative act did *not* cause the victim's death because the victim's voluntary assumption of the risks associated with having his identity disclosed was an intervening act that removed the causal connection between the police's act and the victim's injury.

The majority concludes that this case is like *Summar* because "Fitzgerald voluntarily assumed the risk of a dog attack when she attempted to coax the dog" out of the home. Maj. Op. at 7. This comparison is misleading. In that case, the police offered Summar a deal after he was arrested for marijuana possession: he could serve as an informant and publicly testify on behalf of the government in exchange for favorable treatment by the district court in his pending case, or he could decline to do so and face the full consequences of his crime. *Summar*, 157 F.3d at 1059. The majority says that, just as Summar voluntarily chose to become a testifying witness after being fully appraised of all the associated risks, Fitzgerald voluntarily chose to follow Ehart's orders and knowingly assumed all the risks related to the handling of the dog.

But that conclusion is wrong. This case is actually much closer to *Nelson*, where the plaintiff did prevail under a state-created danger theory. In *Nelson*, the police confronted Shelly Hilliard after observing her with marijuana. 845 F.3d at 698. To avoid arrest, Hilliard voluntarily agreed to become a confidential informant and conduct a controlled purchase of drugs from her dealer; however, she never agreed to provide public testimony. *Id.* Hilliard called to order drugs from her dealer, and police intercepted the dealer's car. *Id.* During the police's interaction with the dealer, one of the officers revealed Hilliard as the informant, which triggered a chain of events that led to the dealer murdering Hillard. *Id.* at 699. Hilliard's mother sued, and we held on summary judgment that Hilliard's mother had satisfied the elements of a substantive due process claim under the state-created danger doctrine, including the affirmative

act element. *Id.* We reasoned that, although Hilliard consented to serve as an informant, she did not consent to having her identity exposed, which meant that she did not voluntarily assume the risk created by the police's actions.

Comparing the facts of these two cases, it is abundantly clear that like Hilliard—and unlike Summar—Fitzgerald was not aware of and thus did not voluntarily assume the risks associated with her participation in the dangerous activity of wrangling the dog. Summar knew exactly what risks he was getting himself into when he agreed to be a testifying witness. He made his decision "[a]fter some discussion" with police, and he even executed a confidential information sheet that "indicated [his] understanding that his status as a confidential informant would be conditioned upon his willingness to . . . testify in open court." *Summar*, 157 F.3d at 1056.

Fitzgerald, however, did not and could not have known the risks that awaited her when she followed Ehart's command to remove the dog from Motter's home. Fitzgerald, who was untrained in animal control, certainly did not understand the extent of the danger to which she was exposing herself and others in attempting to retrieve the dog. She likely understood Ehart's command as an indication that it was safe for her to handle the dog alone—a natural reaction to instructions from an official purportedly trained in animal control. It is also unclear from the record before us whether Fitzgerald knew that the Ehart was unarmed when he arrived at the scene, but it is entirely reasonable to infer that she did not realize that he was utterly unequipped to provide any sort of meaningful intervention in the event of an attack. The majority is thus mistaken to conclude that "Fitzgerald broadly knew about the possible dangers her decision might expose her to." Maj Op. at 8. There is good reason to believe the opposite—that Fitzgerald understood Ehart's presence as a strong assurance of safety and that she did not understand the peril that awaited her. We can thus infer from the complaint that Fitzgerald undertook to collect the dog *only* on the very reasonable assumption that Ehart was properly equipped with a weapon and would come to her—or her friend's—aid if the dog attacked. Indeed, the fact that she had felt unsafe to remove the dog on her own prior to the arrival of an animal control officer indicates that she believed that Ehart, in his capacity as a public safety officer, provided a degree of safety and security that did not exist without him there. She could

not possibly have known that Ehart would take virtually no steps to intervene once the dog attacked.

The "choice" that Fitzgerald made to follow Ehart's instructions is thus akin to Hilliard's choice to become an informant because Fitzgerald's "voluntary election to" retrieve the dog unassisted "did not come with conditions that would have put her on notice" about the extent of the risk that she was assuming. *Nelson*, 845 F.3d at 700. I therefore cannot endorse the majority's completely unreasonable position that Fitzgerald possessed the requisite degree of knowledge and understanding required to voluntarily assume the risk created by the Ehart's actions.

It also bears emphasis that Fitzgerald likely felt that she had little choice but to follow Ehart's instructions to retrieve the dog. Consider the fast-moving events of this case from Fitzgerald's perspective: She called 911 to procure law enforcement's help in removing a dangerous dog; when law enforcement arrived, the officer insisted that she remove the dog on her own. And based on the facts alleged in the complaint, it does not appear that Ehart discussed any alternative options for removing the dog. Because directives from law enforcement officers "carr[y] substantial authoritative weight," Fitzgerald probably felt compelled to comply with Ehart's instruction to remove the dog unassisted, especially when Ehart continued to insist that Fitzgerald do so notwithstanding her reluctance. *Gardenhire v. Schubert*, 205 F.3d 303, 314 (6th Cir. 2000) (discussing police officer, specifically). This stands in contrast to *Summar* where the police clearly offered the informant multiple options and discussed the risks and benefits of the various choices he could make. *See* 157 F.3d at 1059 ("[Police] merely asked [Summar] to serve as an informant and did not impose any constraint on his freedom to act. Rather than strip Summar of his choices, [police] provided him with an option that would allow him to be treated favorably by the district attorney.") (cleaned up). The majority is thus mistaken to characterize Fitzgerald's acquiescence to Ehart's commands as a consensual and voluntary—faced with instructions from law enforcement, Fitzgerald likely felt compelled to obey. Accordingly, I would not conclude, as the majority does, that Fitzgerald's decision to obey Ehart constitutes an intervening act breaking the causal chain between Ehart's actions and Steeb's injury.

Now a few words about Plaintiff Steeb.  The majority in effect limits its analysis to the question of whether Ehart caused a danger as to Fitzgerald, and thus never grapples with the extent to which Ehart endangered Steeb, the actual plaintiff in this case.  However, it is clear that, by insisting that Fitzgerald retrieve the dog, Ehart unleashed a dangerous animal that directly put Steeb's safety in jeopardy and resulted in him suffering permanent injuries.  That Steeb made the "choice" to exit his car and come to Fitzgerald's aid once the dog began attacking her does not render his act a superseding cause breaking the causal connection between Ehart's command and Steeb's mauling.  "[T]he chain of causation is not broken by an intervening act which is a normal reaction to the stimulus of a situation," and Steeb's rescue attempt certainly represented the "natural impulse to rush to [another's] assistance in emergency." *New York Cent. R. Co. v. Brown*, 63 F.2d 657, 658 (6th Cir. 1933).  Ehart's actions thus "directly increase[d] the vulnerability of [Steeb] to danger" presented by the dog.  *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002).

Indeed, Steeb only found himself in a position where intervention was necessary because Ehart's original order to Fitzgerald placed her in the line of danger.  There is thus a clear and unbroken causal chain between Ehart's action and Steeb's injury: because Fitzgerald obeyed Ehart, the dog attacked her; because the dog attacked Fitzgerald, Steeb predictably came to her aid; and because Steeb intervened, he was seriously wounded.  Though Steeb may have chosen to assist Fitzgerald, his involvement was a natural and predictable consequence of Ehart's affirmative act, as Hilliard's death was a natural—albeit delayed—consequence of the officer's alleged disclosure.  There is thus no doubt that Ehart took an "affirmative act that create[d] or increase[d] the risk" to Steeb when he ordered Fitzgerald to detain the dog, satisfying the first element of the state-created danger doctrine. *McQueen*, 433 F.3d at 464.

## 2. Specific Danger to Steeb

Although the majority ends it analysis after concluding that Steeb's complaint failed to plead the affirmative act element, I proceed to consider the other elements of the state-created danger test, which I would hold that Steeb's complaint has sufficiently alleged.  We next assess the second element, asking whether the plaintiff has alleged facts showing a special danger to himself.  "[A] special danger exists where the state's actions place the victim specifically at risk,

as distinguished from a risk that affects the public at large." *Id.* at 468 (internal quotation marks omitted). This element is easily satisfied on the facts pled in Steeb's complaints.

Steeb was one of a few individuals in a small area in proximity to the dangerous dog. Ehart ordered Fitzgerald to approach the dog as it was secured in Motter's house, and bring it to his truck in Motter's circular driveway. Only Motter, Fitzgerald, Ehart, and Steeb were in the area of the home at the time of the order and the attack: Motter was in her home; Fitzgerald was moving between the driveway and the house; Ehart was in the driveway, eventually securing himself in his vehicle; and Steeb was in his vehicle in the driveway, eventually exiting the vehicle to aid Fitzgerald. The complaint alleges that no other persons were on the property at the time of Fitzgerald's attempt at containment and the resulting attacks. Ehart's order that Fitzgerald remove the dog to his vehicle, provoking it in the process, therefore introduced a danger specifically to these people. They were located within the path Fitzgerald needed to traverse to contain the dog, and within the immediate range of a dog attack. This proximity is sufficient to satisfy the special danger element.

In *McQueen* we recognized that the special danger element was satisfied when "five children [we]re left in a room alone with an armed classmate," because the armed student was much more likely to shoot the students in his immediate presence. 433 F.3d at 468. We did "not discount the risks" the student posed to those outside the school because he could have left the school and shot someone outside the school, for instance. *Id.* This case presents an analogous situation: the violent dog could have run from the driveway and bitten a passerby, but this risk is "smaller than and collateral to the risks faced by" those in immediate proximity, and does not defeat Steeb's allegation of the special danger element. *Id.* I would therefore hold that Steeb has properly alleged that Ehart's order created a special danger to him, and that the second element of his substantive due process claim is thus satisfied.

### 3. Requisite Culpability

The third element of a substantive due process claim proceeding under a theory of state-created danger is that the state official act with "the requisite culpability to establish a substantive due process violation." *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.,* 954 F.3d

925, 932 (6th Cir. 2020) (internal quotation marks omitted). If the official acts with the requisite degree of culpability, his conduct will violate the Due Process clause if it is also "so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* (internal quotation marks omitted).

These descriptors are "open-ended." *Id.* (internal quotation marks omitted). So, in *Jackson Local*, this Court determined that a state actor possesses the requisite degree of culpability if, in circumstances in which he has "the opportunity for reflection and unhurried judgments," he acts with deliberate indifference toward that safety of the plaintiff. *Id.* The facts of the complaint show that Ehart was able to, and did, act after time for reflection: he ordered Fitzgerald to contain and move the dog when the dog was secured in the home. He thus had ample opportunity to assess the situation when the threat was still contained. We therefore assess his culpability to determine if he acted with deliberate indifference toward Steeb.

To find a state official deliberately indifferent at the motion to dismiss stage, a plaintiff must allege that the official understood from the situational facts that a "specific" and "substantial risk of serious harm exist[ed]" as to the plaintiff. *Id.* (internal quotation marks omitted). The official next must "act or fail to act in a manner demonstrating reckless or callous indifference toward the individual's rights" in the face of that risk. *Id.*

As described in the proceeding sections, Steeb has alleged facts showing that Ehart was on notice of the specific risk that the dog would violently attack Steeb and Fitzgerald: Ehart knew about the dog's violent history based on his own prior experience with the dog and from what Fitzgerald communicated to Ehart at the scene. And the fact that Ehart secured himself in the safety of his truck after instructing Fitzgerald to remove the dog from the home strongly indicates that Ehart understood that the dog posed a serious risk of violence and sought to protect himself from that risk.

Because Ehart was specifically aware of the violent tendencies of the dog and its proclivity to attack, this case is unlike *McQueen*, in which we held that the first-grade student shooter's prior violent behavior—such as stabbing classmates with a pencil—did not provide sufficient notice to his teacher that his behavior "would escalate . . . to shooting with guns."

*Jackson Loc.*, 954 F.3d at 934 (6th Cir. 2020) (quoting *McQueen*, 433 F.3d at 470). Unlike children, who can exhibit a wide range of aggressive behavior that will usually not escalate to gun violence, violent dogs are usually prone to attack. We therefore conclude that Ehart was aware of the substantial risk of serious harm that the dog posed to those in the vicinity of Motter's home, including Steeb.

But to have acted with "reckless or callous indifference, . . . a public official must do more than be aware of a substantial risk of serious harm. The official's response to that harm must also be 'conscience shocking.'" *Id.* We have previously declined to find that official's actions were conscious shocking when the official was forced to act or to make a snap decision in extreme haste or emergency situations. "When, for example, a government official acts recklessly during a fast-paced car chase or amid a prison riot, we are unlikely to find that he was deliberately indifferent to a known risk of harm." *Mitchell v. City of Benton Harbor, Michigan*, 137 F.4th 420, 431 (6th Cir. 2025).

As discussed, Ehart was not forced to make any decisions under circumstances presenting the same exigencies as a prison riot or a car chase. He had time to deliberate on a course of action while the dog was secured in the home, as evidenced by the fact that he took the time to confer with Fitzgerald, instructed Fitzgerald on how to contain the dog, and secured himself in his vehicle. Ehart had "the opportunity for reflection and unhurried judgments," and, despite his clear subjective awareness "of a substantial risk of serious harm to the plaintiff" presented by the dog, ordered Fitzgerald to remove the dog unassisted. *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 536 (6th Cir. 2008).

Ehart's decision was also not made in "pursui[t] of a legitimate governmental purpose." *Id*. *Cf. Hunt*, 542 F.3d at 543 ("[E]ven where the governmental actor may be aware that his action poses a substantial risk of serious harm to the plaintiff, where some countervailing, mandatory governmental duty motivated that action, the action will not shock the conscience."). The City of Battle Creek employs Animal Control Officers to advance the governmental objective of *protecting* civilians from dangerous animals. Ehart's actions did the opposite—they exposed Fitzgerald and Steeb to an increased level of danger from a violent animal.

Called upon to discharge a duty, Ehart abdicated that duty, instead enlisting a private citizen to do his job. On the facts of the complaint, there was no reason for Ehart to decline to remove the dog himself, and to order Fitzgerald to do so. Ehart's insistence that Fitzgerald contain the dog, while he hid in his car, inflicted great harm—and permanent injury—on the very people he was assigned to protect. This "constitute[s] a denial of fundamental fairness," is "shocking to the universal sense of justice," and establishes Ehart's culpability for a substantive due process violation. *Mitchell*, 137 F.4th at 431 (citation omitted).

Thus, I would find that Steeb adequately pled all three elements of the state-created danger doctrine and reverse the district court's dismissal of his § 1983 action. The purpose of § 1983 is to provide a remedy to parties whose rights were harmed by government officials abusing their power, *see Monroe v. Pape,* 365 U.S. 167, 172 (1961), and Steeb should be afforded the opportunity to pursue his claim under that statute in court.

**B. Qualified Immunity**

In the proceedings below, Ehart asserted qualified immunity from suit. Because the majority concludes that Steeb did not allege a viable § 1983 claim in the first instance, it does not reach the qualified immunity issue. However, because I would hold that Steeb has alleged a viable substantive due process claim under the state-created danger doctrine, I write to briefly address how the qualified immunity issue should be resolved.

In my view, Ehart is not entitled to qualified immunity. In determining whether government officials are entitled to qualified immunity, this Court conducts a two-step inquiry: determining "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (internal quotation marks omitted). As discussed, I believe that Steeb has established that Ehart violated his constitutional rights. However, the district court concluded that, irrespective of such a violation, Steeb had not met "his burden of showing that the law covering these circumstances was clearly established." Order, R. 43, Page ID #507.

The district court's decision was premature at this juncture, without the benefit of further briefing and discovery. At the motion to dismiss stage, "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Hart v. Hillsdale Cnty.*, 973 F.3d 627, 635 (6th Cir. 2020). Based on the facts of this case, it is preferable that a district court resolve the question of the officer's entitlement to qualified immunity at summary judgment or thereafter. *Id.* That is because "development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law." *Id.*

In light of these considerations, I would also reverse the district court's decision granting qualified immunity and remand for further proceedings in accordance with this opinion.

## C. Municipal Liability

Steeb also brought a municipal liability claim against the City of Battle Creek. Steeb argues that Battle Creek violated § 1983 by failing to adequately train, supervise, and equip Ehart to handle dangerous dogs. Based on its holding that Steeb has not alleged facts arising to the level of a constitutional violation, the majority concludes that the district court properly dismissed Steeb's vicarious liability claim against the City.

There is no dispute that Ehart was employed by the responsible municipality and that he was held out by the municipality as a duly responsible and trained animal control officer.

Because I would hold that the district court's dismissal of Steeb's § 1983 substantive due process claim was in error, I would also reverse and remand the dismissal of the derivative municipal liability claim against the City for the district court to consider the merits of that claim in the first instance. *See Saalim v. Walmart, Inc.*, 97 F.4th 995, 1016 (6th Cir. 2024). We should not deny Steeb his day in court, as the majority would have us do. We should permit the jury to make the final determination in this matter.